IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

04 SEP 15 PM 3: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DEBRA DAVIS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.: CV 02-P-1823-E |
| | } | |
| CITY OF ANNISTON, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Pending before the court is Defendant City of Anniston's Motion for Summary Judgment (Doc. #23) filed on June 6, 2003. Having considered the briefs and evidentiary submissions in support of and in opposition to summary judgment, the court finds that Defendant's motion is due to be granted in part and denied in part.

Plaintiff Debra Davis ("Plaintiff") filed this lawsuit against the City of Anniston (the "City") and the Anniston Police Department ("APD") on July 24, 2002, alleging that she was discriminated against on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and in violation of 42 U.S.C. § 1983.[1] Plaintiff was an officer with the APD for over twenty-three (23) years and is only the second woman to attain the rank of Lieutenant, which is just below the position of Captain, and two down from the position of Police Chief. Plaintiff's complaints about gender discrimination include allegations of failure to promote, abusive working environment, and constructive discharge. The City denies any liability with respect to these claims and argues that it is entitled to judgment as a matter of law. For the reasons stated below, Defendant's motion is due to be granted in part and denied in part.

---

[1] The court dismissed the Anniston Police Department from the case on September 18, 2002.

I.      **Statement of Facts**

    A.      Background

Plaintiff became a police officer at the APD on December 14, 1979. (Admitted Fact ("AF")

No. 6). Upon Plaintiff's hiring, she became the fifth female officer hired by the APD. (Pl's Depo.

at 1-26). Plaintiff became a Sergeant on June 11, 1990, and a Lieutenant on July 5, 1996. (AF No.

3).

    Wayne Chandler ("Chief Chandler") was the APD's Chief of Police during Plaintiff's entire

career. (AF No. 3). Chief Chandler appointed Davis as the Training & Inspections ("T&I") Officer

on March 2, 1998. (Ex. 1-A to Pl's Depo., which is included in Dft's Evid. Sub. at Tab B; Chandler

Depo. at 44). The T&I function operates as a unit of the Chief's office. (John Dryden Depo. at 71).

The T&I Officer coordinates training, does background investigations on applicants for employment,

schedules applicants for interviews, and handles internal affairs investigations. (Pl's Depo. at 1-48,

49; Dryden Depo. at 69). In her position as the T&I Officer, Plaintiff reported directly to then Chief

Chandler. (Pl's Depo. at 1-46).

    Under the Civil Service Board ("CSB") rules, an employee must be an officer to be promoted

to Sergeant, a Sergeant to be promoted to Lieutenant, a Lieutenant to be promoted to Captain, and

a Captain to be promoted to Chief. (Lisa Seymour Aff. ¶ 21.) Plaintiff and Ralph Turner ("Turner")

were promoted to Lieutenant on the same day of July 5, 1996. (Pl's Depo. at 1-89; DX 1-G). Turner

was still a Lieutenant when he retired in 1999. (Pl's Depo. at 1-116; Seymour Aff. ¶ 11). Plaintiff

held the position of T&I Officer through her last day of work with the City on May 30, 2002. (Pl's

Depo. at 1-34; DX 1-A, 1-H). Plaintiff's retirement became effective on July 8, 2002.

B.      Failure to Promote

During most of Chief Chandler's employment (1967-2002), the APD had only three

Captains.[2]  At various times during Plaintiff's tenure with the APD, there had been four Captains

working for the APD.  For example, when Plaintiff first began at the APD there were four Captains.

There were also four Captains when Bob Parker was put in charge of the Crime Stoppers.  When

Plaintiff became the T&I Officer, there were four Captains, including Tom Wright ("Wright"), an

APD officer assigned to the Calhoun County Drug Task Force.  (Pl's Depo. at 1-216-21).

According to John Dryden[3] ("Dryden"), there were no openings for a Captain's position when

Wright was promoted.  Wright had been promised the position and Chief Chandler promoted him.[4]

Wright retired as Captain in 1998 or 1999 to take another job.  A list of eligibles was established by

the Anniston CSB after Wright's retirement, as required by the Board's regulations.  (Chandler Depo.

at 63-65; Ex. 16 to Pl's Depo., contained in Tab B of Dft's Evid. Sub.).  Plaintiff and others applied

---

[2]"Q     During most of your years with the Anniston Police Department, were there three
        captains?
 A     During most of it.  We had four at one time because one of them was promoted and
        was over the Calhoun County Drug Task Force.  And when he retired, they did away
        with that position.
 Q     Was that Tom Wright?
 A     Yes, sir.
 Q     So, during most of the time, there were only three captains, not four?
 A     Most of the time, yes."

(Chandler Depo. at 61).

[3]John Dryden is the current Chief of Police at APD; he served as a Captain from 1987 until
May 2002, and then as Interim Chief from May 2002 until he was appointed Chief in December
2002.  (AF No. 3).

[4]Captain Dryden knew nothing about Wright's promotion until he came in one morning and
saw a memo from Chief Chandler promoting Wright.  (Dryden Depo. at 66).

3

to take the Captain's test. (Pl's Depo. at 1-222; Chandler Depo. at 61-62; Ex. 16 to Pl's Depo., which is included in Dft's Evid. Sub. at Tab B).

Chief Chandler evaluated Plaintiff in July 1998 for the period July 5, 1997 through July 5, 1998. Chief Chandler stated therein, "Lt. Davis is among the best officers in this department. Her ability to achieve the rank of Captain is superior and well within her reach in the near future." (Ex. 20-A to Pl's Depo. at 2, attached as Ex. E to Opp. Evid. Sub. in Resp. to Ex. D of the Court's order (Pl's Evid. Sub.)). Chief Chandler also evaluated Plaintiff in July 2001 for the period July 5, 2000, through July 5, 2001. In that evaluation, Chief Chandler stated as follows:

> Her position as the Internal Affairs Officer and female are facts that some personnel use as an excuse to ridicule her, her performance and competence, and even personally attack her character, ethics, and morality. Some attacks are due to the personal bias of certain ranking individuals, and others with whom she is in competition for promotion to Captain. That negativity spread by some ranking personnel impacts the opinion of younger officers totally unfamiliar with and who have no personal knowledge and little day to day contact with her.

(Ex. 20-D to Pl's Depo. at 3, contained in Dft's Evid. Sub. at Tab B). Chief Chandler further stated that Plaintiff was "the most qualified, dedicated, and motivated Lieutenant in the Department and deserving of the next promotion to 'Captain.' I made such a recommendation to the City Manager in the past year and I am thoroughly convinced that her abilities, skill, knowledge, maturity, and practical approach to police work are superior to her peers." *Id.*

Regardless of whether there is a job opening, the law requires the CSB to prepare a list of eligibles, consisting of those who have applied and passed the exam. (Chandler Depo. at 62; Whitehead Depo. at 287-88). The CSB's list of eligibles for Captain in 1999 – obtained by subpoena from the CSB – contained the following: Roy Stemen, Debra Davis, Layton McGrady, James Reaves, and Billy Lett. (DX 16, Pl's Depo. at 1-225). Chief Chandler discussed with City Manager

4

Richard Whitehead ("Whitehead") his wish for Davis to be promoted to Captain on several occasions. Mr. Whitehead told Chief Chandler and Plaintiff that he would not promote her to Captain because she did not have a college degree. (Chandler Depo. at 49-50). At the time, Davis was on the list of eligibles to be promoted to Captain.[5] (Ex. 16 to Pl's Depo., contained in Tab B of Dft's Evid. Sub.).

Plaintiff was never promoted to Captain. The record evidence reveals that there have been two reasons articulated for not promoting Plaintiff to Captain. First, Whitehead testified he "did not see the need for [a fourth Captain position] because it would require "additional moneys to fund the position." (Whitehead Depo. at 260-62). Second, Chief Chandler testified that when he requested that Plaintiff be promoted to Captain, Whitehead refused because Plaintiff did not have a college degree. (Chandler Depo. at 50). Whitehead denies providing that reason. (Whitehead Depo. at 256-58).[6]

According to Chief Chandler, Whitehead never told him that he wanted to save the City money by not having a fourth Captain. The only reason Whitehead told Chief Chandler for not promoting Davis was that she lacked a college degree. (Chandler Depo. at 63-64). After Plaintiff retired, Whitehead promoted Layton McGrady to Captain. (Whitehead Depo. at 242). McGrady was just short of earning a college degree at the time he was promoted. (*Id.* at 243). Furthermore, when McGrady was interviewed by Whitehead, he was not told that he was required to have a four year

---

[5]Plaintiff told Chief Chandler that she believed Whitehead would not promote her because of her gender. (Chandler Depo. at 48-50).

[6]To be sure, it is a fairly unique circumstance for the court to consider an "articulated reason" which a decisionmaker has disclaimed making. However, given that Chandler, the Chief of Police, testified that it was a reason provided to him, the court will evaluate it as part of a pretext analysis.

degree in order to be promoted to Captain. (McGrady Depo. at 109).

     C.     Hostile Work Environment

During Chief Chandler's tenure, Dryden was the Commander of the Uniform Patrol Division

("UD"). Thereafter, Dryden became interim Chief and eventually Chief of Police. When Plaintiff

was appointed T&I Officer, Dryden had occupied an office directly across the hall from Chief

Chandler for several years. (Chandler Depo. at 53; Dryden Depo. at 254-55.) When the Anniston

Municipal Court was moved out of the APD building, Chief Chandler reconfigured the vacated space

in the APD building. When the renovations were complete, Chief Chandler moved Dryden to a new

office and moved Plaintiff into Dryden's former office. The evidence submitted on summary

judgment indicates that the move and the evolving relationships between Chief Chandler and Dryden

on the one hand, and Chief Chandler and Plaintiff on the other, created friction and mistrust between

Dryden and Plaintiff. For example, it came to Plaintiff's attention that Dryden said of the move,

"[T]hat stupid, fucking bitch has got the power office." (Pl's Depo. at 1-296.) Another employee

of the APD, Karen Edwards, testified similarly that Dryden would refer to Plaintiff as that "stupid,

fucking bitch." Edwards further testified that Dryden did not stop calling Plaintiff this name until

she (Edwards) filed an EEOC charge against the City. *Id.* at 294-95. Plaintiff testified that it was

not uncommon for Dryden to use that term when he referred to females with whom he was unhappy

or dissatisfied. *Id.* at 1-311-12.[7]

---

[7] The summary judgment evidence suggests that Dryden made other inappropriate comments about and to female employees. Those are cataloged in the Plaintiff's Statement of Additional Facts contained in her Response to Defendant's Motion for Summary Judgment. Chief Chandler believed that Plaintiff was a victim of sexual harassment by Dryden. Other witnesses have asserted that Dryden made demeaning and unenlightened references to women (*e.g.,* "barefoot and pregnant"; "scaredy-cat women"; "fat ass bitches"; and "at home in the kitchen"). Again, however, it is unclear, at best, to what extent any of those remarks were made in front of Plaintiff.

Although the Rule 56 evidence presented to the court indicates that Dryden made these remarks, Plaintiff concedes that she never heard him make the comments herself. (Pl's Depo. at 2-219; 1-312; 1-286 & DX 26, No. 12). Dryden does not deny referring to Plaintiff as a "bitch," but does note that he has referred to a male police officer using the same term. (Dryden Depo. at 371-72). Similarly, the summary judgment evidence indicates that Plaintiff used a variation of the term (*i.e.*, bitching) with reference to Dryden. (DX 34 at 18, 19, 25-26, 44, 51).

Plaintiff asserts that others besides Dryden created a hostile work environment in the APD. During the Summer of 2001, a derogatory parody of a female patrol officer, Karen Lawson, was posted on a bulletin at the APD. Plaintiff was called upon to investigate the posting of the document. When she completed her investigation, she determined that Sgt. Russell Buckalew had prepared the document. Chief Chandler believed that the parity constituted sexual harassment and violated the policies of the department. Although he sent a request for disciplinary action of Buckalew to the City Manager (asking that Buckalew be demoted), the City Manager did not discipline Buckalew. After Plaintiff's investigation of him, Buckalew wrote about the incident in his internet diary.[8] There, he ridiculed Plaintiff and her job performance and said that Plaintiff called Chief Chandler "daddy" when speaking to him and that she had "orgasmic glee" when telling the Chief about Buckalew having been "naughty."

D. Constructive Discharge

In 2002, the Alabama Legislature amended the Policemen's and Firemen's Retirement Act ("P&F Act") to provide for retirement after twenty years service. (Pl's Depo. at 2-38; Chandler

---

[8]There does not appear to be evidence that Buckalew's internet diary was condoned by, associated with, or connected to the APD.

Depo. at 64). Plaintiff gave notice on May 3, 2002, that the effective date of her retirement would be July 1, 2002 (*i.e.*, the effective date of the amendment to the P&F Act).[9] (Pl's Depo. at 2-37; DX 21). Plaintiff was later told "that if waited until the 8[th] [of July 2002] that I would receive another [pay] increase .... So I postponed it to the 8[th]." [10] (Pl's Depo. at 1-17).

Plaintiff claims that she resigned because Chief Chandler was leaving the APD and, among other things, she feared Dryden would move her out of the T&I Officer position. Plaintiff told Chief Chandler "if she didn't leave when [she] did that she was going to catch hell; that she would be moved right off the bat, because she knew they weren't going to leave her in [her] position."[11] (Chandler Depo. at 65). Indeed, Plaintiff testified that she was told by Dryden that "there was a line drawn in the sand and that when the power shifted and he was in charge ... [hers] was the first head that was going to come off." (Pl's Depo. at 1-316).

In a July 3, 2002 letter to the City Manager, Plaintiff characterized her reason for leaving as "fear of reprisal as promised" by John Dryden and said, "I recognize that retaliation is

---

[9]May 30, 2002 was actually Plaintiff's last day of work with the City "because that's when [she had to get out to start the other job [with APCO]." (Pl's Depo at 2-41). After her last day of work with the City on May 30, 2002, up to the effective date of her retirement on July 8, 2002, Plaintiff was both working for APCO and receiving vacation pay from the City. (Pl's Depo. at 2-41-42).

[10]Plaintiff received a pay increase on July 5, 2002. (Pl's Depo. at 1-188-89). While she last worked on May 30, 2002, the raise on July 5, 2002, has been factored into the computation of her benefits. (Pl's Depo. at 1-189; 2-38).

[11]She also told Chief Chandler, however, that if the Legislature passed the bill to set up retirement after twenty years, "she was definitely going to retire because she had other job offers." (Chandler Depo. at 64).

8

forthcoming."[12] (DX 26, Nos. 28 and 36). As of her last day with the City on May 30, 2002, Dryden "was not in charge at that point in time" and nothing had been done to carry out the "promised retaliation." (Pl's Depo. at 2-23).

## II.   Summary Judgment Standard

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

---

[12]In her July 3, 2002 letter to the City Manager says, Plaintiff said,"It is for that reason that I am leaving my employment with the City of Anniston combined with the fact that you have made it clear that I have no chance for advancement." (DX 26, No. 25).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

### III.    Plaintiff's Title VII Claims

#### A.    Promotion

In order for Plaintiff to demonstrate a *prima facie* case of gender discrimination, Plaintiff must show that (1) she is a member of a protected group; (2) an adverse employment action took place; (3) she and a similarly situated, non-protected person received dissimilar treatment; and (4) sufficient evidence, either circumstantial or direct, exists to infer a nexus or causal connection between the protected category and the disparate treatment. *See Pugh v. Heinrich*, 696 F. Supp. 533, 540 (M.D. Fla. 1988), *aff'd*, 933 F.2d 1020 (11th Cir. 1991).

The *prima facie* case for establishing discriminatory failure to promote based upon circumstantial evidence is flexible. *See Jamerson v. Board of Trustees*, 662 F.2d 320, 322 (11th Cir. 1981) (noting that *prima facie* standard for circumstantial evidence cases is flexible and citing *McDonnell Douglas Corp.*, 411 U.S. at 802). The *prima facie* case method was "never intended to

be rigid, mechanistic, or ritualistic." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978); *McDonnell Douglas Corp.,* 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations"). Here, during Plaintiff's tenure, there had in the past been four Captains on the APD, and the most recent time that a fourth Captain was promoted, there was no opening for a Captain position. Further, the APD Police Chief, Chandler, recommended Plaintiff for promotion to the rank of Captain and was not told funding a fourth Captain position was a problem, but rather that Plaintiff's not having a college degree was. After Plaintiff left the APD, a fourth male Captain was promoted, and he did not have a college degree. The methods of presenting a *prima facie* case are not fixed; they are flexible and depend to a large degree upon the employment situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984). The court has no hesitation in finding that Plaintiff has established a *prima facie* case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class. *See, e.g., McDonnell Douglas Corp.,* 411 U.S. at 802; *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).

When Plaintiff establishes a *prima facie* case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas,* 285 F.3d at 1342; *Combs,* 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254-55. If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the

11

Plaintiff to offer evidence that the alleged reason of the employer is pretext for illegal discrimination. *Id.* at 255-26. The evidence of pretext may include the same evidence offered initially to establish the *prima facie* case. *See Combs*, 106 F.3d at 1528.

In *Reeves v. Sanderson Plumbing Prods., Inc.*, the Supreme Court explained that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). A plaintiff may be able to establish that the employer's asserted justification is false and a pretext for discrimination based on some of the same evidence that established a *prima facie* case of discrimination. *Id.* A plaintiff need not "always introduce additional, independent evidence of discrimination." *Id.* at 148.

After carefully examining the record, the court concludes that Plaintiff's "*prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* A genuine issue of material fact exists regarding whether the failure to promote Plaintiff was based on her sex. That is, Plaintiff has pointed to enough evidence in the record to create material questions of disputed fact for a jury to resolve. Among other material yet unresolved issues,[13] it is for a jury to decide whether the explanation that the City could only[14] use and afford to have three Captains during the time in which Plaintiff would have been eligible for the promotion to Captain is credible when (1) at other

---

[13] It is unnecessary for the court to delineate every genuine issue of material fact as the existence of one precludes the entry of summary judgment on Plaintiff's promotion claim.

[14] As Plaintiff notes, it is odd at best for Whitehead, the City Manager, to dictate to Chandler, then the Police Chief, how many Captains the APD needed. This is particularly the case given Whitehead's testimony that he did not micro-manage City departments (like the APD) and allowed department heads (like Chandler) to run their departments.

times (*i.e.*, from 1992 through 1998) the City was able to support four Captains;[15] and (2) Whitehead did not raise any issue about funding with Chief Chandler when Chandler recommended Plaintiff's promotion. Similarly, a fact issue exists as to why the City Manager for Anniston would tell Plaintiff and Chief Chandler that Plaintiff would not be promoted to Captain because she did not have a college degree despite the fact that Chief Chandler expressed his belief that Plaintiff should be promoted and despite the fact that the City subsequently promoted Layton McGrady to the position of Captain (upon the departure of Plaintiff from the force) when McGrady had not yet completed his college degree at the time of his promotion.

      B.     Hostile Work Environment

      Plaintiff asserts a claim of sexual harassment. She claims that she was harassed because of her sex by co-employees.[16] Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). Title VII has been interpreted to specifically allow claims for harassment to rest upon the theory of a hostile work environment.[17] *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998);

---

    [15]It is not lost on the court that Chief Chandler testified that the primary reason Tom Wright had previously been promoted to Captain was that he was promised the position.

    [16]While Captain Dryden held a position higher than that of Plaintiff as Lieutenant, there is no evidence in the summary judgment record that Captain Dryden ever supervised Plaintiff or that Plaintiff ever reported to him, which makes the co-employee hostile work environment analysis applicable.

    [17]The *Ellerth* and *Faragher* decisions indicate that courts should no longer use the abusive work environment label in analyzing whether an employer should be held liable on a Title VII claim in which no tangible adverse employment decision has been made. *See Ellerth*, 524 U.S. at 753, 765; *Faragher*, 524 U.S. at 807. Instead, in analyzing claims that heretofore traditionally would have been labeled "abusive work environment" claims, courts should now ask only whether the

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). A plaintiff attempting to show that he has been subjected to a hostile work environment must prove certain elements to establish the claim. These elements include proof that: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.[18] *See Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Plaintiff has put forth great effort in arguing that the conduct directed at Plaintiff was because of her sex. (*See* Pl's Opp. at 7-16). Although the record contains evidence that Plaintiff and Dryden were jockeying for favor with Chief Chandler and some of the actions of Dryden (and others) were attributable to that power struggle,[19] the court will assume at least some of the complained of conduct occurred because of Plaintiff's sex. The key question here is, however, whether Plaintiff can put forth sufficient evidence to establish the fourth element enumerated above. The requirements to establish that element are well developed.

---

conduct complained of "is sufficient to constructively alter an employee's working conditions." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

[18]When a plaintiff fails to make the *prima facie* showing of an abusive work environment, the court need not reach the issue of employer liability. And even when the plaintiff successfully makes a *prima facie* showing of harassment involving no tangible employment action, the defendant/employer is not summarily liable.

[19]"Personal animosity is not the equivalent of sex discrimination. The plaintiff cannot turn a personal feud into a sex discrimination case." *McCollum v. Bolger*, 794 F.2d at 602, 610 (11th Cir. 1986) (footnote omitted); *see Succar v. Dade County School Board*, 229 F.3d at 1343, 1345 (11th Cir. 2000).

In order for a plaintiff to establish a *prima facie* case of abusive work environment harassment actionable under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of employment and create an abusive working environment.'" *Faragher*, 524 U.S. at 786 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Title VII is not "a general civility code" nor does it protect against "the ordinary tribulations of the workplace, such as the sporadic use of 'abusive language, gender-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788. Infrequent or "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" to constitute a violation of Title VII.[20] *Id*. The severity of the behavior must be evaluated both objectively and subjectively in light of all the circumstances,[21] *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and only the most extreme harassing conduct will be found to violate Title VII. *See Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81-82; *Meritor*, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable.]").

Moreover, the Supreme Court has said that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 67). Accordingly, unpleasant comments or other unseemly conduct in the work

---

[20]However, the determination as to whether the harassment was sufficiently severe or pervasive should not be based solely on the number of incidents alleged. *See Vance v. Southern Bell*, 863 F.2d 1503, 1510 (11th Cir. 1989).

[21]"The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Mendoza*, 195 F.3d at 1246.

place does not rise to the level of an abusive environment in violation of Title VII.

As the Eleventh Circuit has stated:

> The Supreme Court and this court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the Plaintiff's employment and create a hostile or abusive working environment. *Id.; see Harris*, 510 U.S. at 23, 114 S. Ct. 367; *Henson*, 682 F.2d at 904; *Faragher*, 118 S. Ct. at 2283 (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

*See Mendoza*, 195 F.3d at 1246. Against this legal backdrop, Plaintiff is unable to adduce sufficient evidence regarding her hostile work environment claim to withstand summary judgment.

"First and most importantly," Plaintiff has not presented evidence that any of the conduct about which she complains was "physically threatening or humiliating." *Id.* at 1248. At most, Plaintiff has put forth evidence of mere offensive utterances, not physically menacing or demeaning behavior. *Id.* at 1246. *Cf. Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (examining physical nature of harasser's conduct including repeated attempts to touch employee's breasts, put his hands down her pants, pull off her pants, and entice others to hold her down so that he could grope her).

16

Second, Plaintiff has not presented substantial evidence that the cumulative effect of any harassing conduct unreasonably interfered with her job performance.[22]  During the period in question, Plaintiff received stellar job performance evaluations from Chief Chandler.  Moreover, Buckalew's insubordination toward Plaintiff was punished in that he received a ten day suspension.  Moreover, even in her 2001 evaluation, Chief Chandler stated that the "negativity spread by some ranking personnel impacts on the opinion[s] of younger officers totally unfamiliar with [Plaintiff] and who have no personal knowledge [of] and little day-to-day contact with her." (Ex. 20-D to Pl's Depo.).

Third, Plaintiff has not established that the conduct was sufficiently severe as to be actionable.  Plaintiff concedes that no single event of harassment she allegedly suffered would be sufficient, standing alone, to establish a viable claim of sexual harassment. (Pl's Opp. at 16).  Rather, Plaintiff contends that a review of the "totality of the circumstances" leads to the conclusion that she can present a valid harassment claim to a trier of fact.  *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).  The court disagrees.

---

[22]To the extent Plaintiff asserts that her investigation of harassment claims exposed her to a hostile work environment (because she had to confront the harassment she was investigating), that argument is without merit.  Plaintiff's duties called upon her to conduct investigations into internal affairs.  A finding that someone in Plaintiff's position could be subjected to a hostile work environment simply by having to investigate such an environment would turn both logic and the law on their heads.  Indeed, if such were the law, employers would be limited to hiring an individual from outside the work place to investigate such claims, or using someone within the work place who does not belong to the protected category of the person who was allegedly harassed for such an investigation.

The comments and actions to which Plaintiff has pointed are insufficient to constitute severe and pervasive conduct. Although certainly boorish, they simply fall below the "*Mendoza* line."[23] Dryden's use of the term "bitch" when referring to Plaintiff in discussions with others is not the type of severe and pervasive conduct required to establish sexual harassment. Pivotal in the court's analysis is the undisputed fact that Plaintiff never heard any of Dryden's comments about her directly, and many other incidents were not directed toward her. Also, while Plaintiff did undisputedly endure "behind the back" insults from Dryden, about which she subjectively complains, the nature of Dryden's conduct is not sufficiently offensive from an objective vantage[24] so as to rise to a Title VII violation.[25] Moreover, the unfortunate on-the-job dynamic between Plaintiff and Dryden was reciprocal and personal—both employees seemed comfortable with undermining each other's authority using "bitch" or a variant thereof to describe each other and/or their complaints. Finally, although Plaintiff has pointed to the comments of others besides Dryden, the undisputed facts about those show that they likewise were not sufficiently severe as to violate Title VII.[26]

---

[23]Baseball officionados will recognize this term to mean a batting average below .200. However, in this opinion, the term refers to conduct that falls short of the severe and pervasive standard articulated in cases such as *Mendoza*.

[24]Although Plaintiff's own use of the word "bitching" may bring into question to what degree she was subjectively offended by that term and its related forms, the court bases its ruling on its finding that the conduct complained of by Plaintiff was objectively insufficient to be actionable.

[25]Even one of the main pieces of evidence on which Plaintiff relies – her 2001 annual evaluation – does not show that Plaintiff herself personally was confronted with "ridicule" and "attacks." (Ex. 20-D to Pl's Depo.). While Chandler states that such ridicule and attacks on Plaintiff took place, there is no indication that they occurred anywhere but behind her back.

[26]In her summary judgment opposition, Plaintiff has referenced other derogatory statements and remarks that Dryden and others have made about women. The court accepts that this evidence is presented to establish that the offensive conduct about which Plaintiff complains was because of her sex. However, that additional information does not establish that Plaintiff was subjected to

Reviewing the totality of the circumstances, and particularly distinguishing between conduct that Plaintiff actually witnessed versus the conduct that she learned of second hand, the court does not believe that Plaintiff has established that the harassment was sufficiently severe pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment.

Binding precedent of the Eleventh Circuit and other persuasive authority support this conclusion. The Eleventh Circuit has rejected much more severe conduct than that alleged here as insufficient to state a sexual harassment claim. In *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999), the plaintiff's supervisor constantly watched and followed her throughout the workplace, constantly looked her up and down, twice when looking her up and down stopped on her groin area and made a sniffing motion, once rubbed his hip against hers and touched her shoulder while smiling, and once responded to her by saying "Yeah, I'm getting fired up, too." In measuring this conduct against other harassment cases, the Eleventh Circuit, sitting *en banc*, held that "conduct that is much more severe and pervasive than the conduct shown by Mendoza has been found insufficient as a matter of law to sustain hostile-environment claims." *Mendoza*, 195 F.3d at 1251-52 (discussing cases in which the conduct was substantially more severe, but nevertheless legally

---

severe and pervasive harassment, because there is no showing by her within the Rule 56 record that she, herself, experienced any such statements or conduct. Likewise, the evidence relied upon by Plaintiff that Karen Edwards suffered from sexual harassment can go no further. It certainly shows that Dryden and others were capable of making comments that were sex related, but Plaintiff has not shown that she experienced the same conduct as Edwards. Plaintiff also complains of a website operated by Buckalew on which derogatory comments about her were made; however, as Plaintiff readily concedes, she only learned of the website from fellow officers. (Pl's Depo. at 1-359-60). There is no evidence that Buckalew maintained the website as part of his duties with the APD. In fact, he testified that he discontinued the website when it began attracting "too much attention" from officers of the APD. (Buckalew Depo. at 87).

insufficient); *see also Colon v. Environmental Technologies, Inc.*, 184 F. Supp. 2d 1210, 1218, 1221 (M.D. Fla. 2001) (calling plaintiff a Spanish word that means bitch, whore or prostitute; crotch grabbing; spitting; calling Plaintiff stupid; and hand gesture signifying the "f word" not severe and pervasive); *Breda v. Wolf Camera, Inc.*, 148 F. Supp. 2d 1371, (S.D. Ga. 2001) (coworkers' conduct, which included calling plaintiff and other females "bitches", making sexual comments, ogling other women in employee's presence, sandwiching her between their bodies in extremely close proximity several times when she was near cash register, and other conduct, was not sufficiently severe to establish prima facie case of hostile work environment); *Scott v. Pizza Hut of America, Inc.* 92 F. Supp. 2d 1320, 132 (M.D. Fla. 2000). ("The complained-of acts in this case, in light of *Mendoza* and this Court's earlier holdings, are insufficiently severe or pervasive to support a Title VII or FCRA claim for hostile work environment sexual harassment. First, the complained-of acts are insufficiently severe to amount to a Title VII violation. Scott complains of rude language, comments to her that "[i]f she'd go out and get some sex, she wouldn't be so bitchy," seeing the tracing of an obscene gesture in an air-conditioner's condensation, another employee being picked up and touched, foul lyrics being played in a song and threatening stares from other employees. All of these incidents, while boorish, stupid, and inconsiderate, do not rise to the level of the complained-of treatment in *Mendoza* [and other cases].")

Following *Mendoza's* mandate, the Eleventh Circuit continues to require sexual harassment cases to meet a critical threshold of severity before allowing them to proceed. In *Gupta v. Florida Board of Regents*, 212 F.3d 571, 578-79 (11th Cir. 2000), over a period of six months, the alleged harasser looked the plaintiff up and down, frequently called her at home at night, asked about her boyfriend, asked her if she was in bed, repeatedly asked her to lunch, stared at her legs, touched the

inside of her thigh, lifted the hem of her dress, unzipped his pants in front of her to tuck in his shirt, offered to spend the night with her, told her "I can tell you are innocent and you don't have much experience," and told her that women are like meat and "men need variety in women." Weighing the sufficiency of these facts, the Eleventh Circuit held as follows:

> The alleged harassment in this case exemplifies the ordinary tribulations of the workplace which the Supreme Court and this Court have held do not constitute actionable sexual harassment. [The plaintiff] failed to present evidence that [the harasser's] conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe." The Fifth Circuit recently opined, "all of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment." This is not such a case.

*Gupta*, 212 F.3d at 586 (citations omitted). To hold that the conduct in this case creates an objectively hostile environment would "establish a baseline of actionable conduct that is far below that established in [the Eleventh Circuit as well as] other circuits." *See Mendoza*, 195 F.3d at 1251.

Finally, the record evidence does not suggest that any harassing conduct that Plaintiff herself experienced occurred frequently. Plaintiff acknowledged that Dryden was always nice to her face but talked behind her back. Plaintiff has not presented substantial evidence regarding how frequently she was told second hand of others' comments or how often she experienced insubordinate behavior allegedly brought on by Dryden's "negativism." (The record does show, however, that Buckalew was disciplined for acting insubordinately toward Plaintiff). In any event, "the Eleventh Circuit has held that conduct does not constitute actionable sexual harassment where plaintiff has only demonstrated that the conduct was frequent. Therefore, the alleged frequency of [a harasser's] conduct is not dispositive of whether the conduct was severe and pervasive." *Colon*, 184 F. Supp. 2d at 1220

21

(citing *Mendoza*, 195 F.3d at 1248).

      C.     Constructive Discharge

Plaintiff's constructive discharge claims fail as a matter of law. Plaintiff left the APD because she anticipated that she would be further undermined and harassed by Dryden when it became apparent that he would become the interim Chief and later likely be made the permanent Chief. While undoubtedly this was not a positive development from Plaintiff's perspective, the expectation of future retaliation or harassment does not meet the "quite high" standard that "working conditions were so intolerable that a reasonable person in her position would be compelled to resign." *See Hipp v. Liberty National*, 252 F.3d 1208, 1231 (11th Cir. 2001).

## IV.    Section 1983

Based upon the same facts which underlie her Title VII claims, Plaintiff has filed parallel § 1983 claims. After careful review, the court concludes that Defendant's Motion for Summary Judgment is due to be granted on Plaintiff's § 1983 claims for two reasons.

First, when a plaintiff asserts employment claims based upon the same factual assertions under Title VII and § 1983, the substantive elements of proof are the same under the two statutes. *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2nd 595, 596 n.2 (11th Cir. 1984). Therefore, the non-existence of genuine issues of material fact as to Plaintiff's sexual harassment and constructive discharge claims here calls for the court to grant Defendant's summary judgment motion with respect to those claims.

Second, Plaintiff has not asserted a promotion claim under § 1983. That is, in opposing summary judgment, Plaintiff's sole § 1983 argument is that the City violated her constitutional rights,

and therefore is liable under that statute, because she was harassed by Dryden and others.[27] (Pl's Opp. at 21-25). Therefore, the court need not address whether such a promotion denial was pursuant to a municipal policy. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## V.   Conclusion

In viewing the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party, this court finds that there are issues of material fact to be presented to a jury regarding Plaintiff's promotion claim; however, with regard to Plaintiff's sexual harassment, construction discharge, and § 1983 claims, there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law.   An order consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ___15th___ day of September, 2004.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[27]Given that Plaintiff has not asserted (perhaps for good reason) that the City is liable under § 1983 for failing to promote her to Captain, any such claim is waived. *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned where argument was not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned).  Plaintiff does not respond to this argument and thus is deemed to have abandoned this claim. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1329 (N.D. Ga. 2001). *Cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.")